# Waltz's Appeal

*Victor Braddock*, for appellant.
*Homer L. Kreider*, contra.

HARGEST, P. J., December 10, 1947.—This opinion is in support of the order of this court made November 26, 1947.

This matter comes before us on an appeal from the Pennsylvania Liquor Control Board's refusal to grant a restaurant liquor license to Paul M. Waltz for premises located at 2301 North Sixth Street (corner of Sixth and Emerald Streets) in the City of Harrisburg.

At the hearing before the board the same protestants who testified in court were present and offered to testify. The board did not hear them, but refused the exchange of the liquor license solely on the ground that it violated the Liquor License Quota Act of June 24, 1939, P. L. 806, 47 PS §744-1002. This action of the board is in violation of the law as this court has declared it. The appeal brings the matter before us de novo.

We held in the Appeal of the Country Club of Harrisburg, 55 D. & C. 65, that under the Liquor License Quota Act an exchange of a malt beverage license for a restaurant liquor license was not a "new" retail license within the meaning of the act; and since the board has refused to follow the law as we have declared it we have been required to repeatedly affirm our decision.

Appellant bases his application on section 403 of the Pennsylvania Liquor Control Act of November 29, 1933, P. L. 15, as last amended by the Act of June 16, 1937, P. L. 1762, 47 PS §744-403, and contends that when he has complied with the provisions of that section the issuance of the license is mandatory.

The remonstrants contend, however, that the board has discretion.

As said by Judge Gordon in In re Transfer of Liquor License, 46 D. & C. 93, 95:

"On the question of the powers of the board the authorities appear to be in direct and hopeless conflict."

In Popp's License, 41 D. & C. 500 (1941), the court held:

"Under sections 403 and 408 . . . the Liquor Control Board has no discretion in granting or refusing the transfer of a liquor license if all the statutory requirements are met. . . .

". . . the court of quarter sessions has no wider discretion than that vested in the board and may not consider the equities of the case or otherwise exercise discretionary powers not expressly given by the statute . . ." (Syllabus)

In Pressman's Appeal, 53 D. & C. 507, it is held, construing the same sections:

". . . no standards are explicitly set up to guide the Liquor Control Board as to when it should grant and when it should refuse a proposed license transfer except with respect to the fitness of the applicant, to the proximity of the proposed establishment to a church, hospital or charitable institution, school or playground or to a place where liquid fuels and oils are sold, nor does the act by implication authorize the board to refuse such a transfer whenever it finds it inimical to the public interest to do so, since the power to determine what is and is not in the public interest lies with the legislature . . ." (Syllabus)

In Barabas' Appeal, 54 D. & C. 94 (1945), the court held:

". . . the sole function of the Pennsylvania Liquor Control Board is to review the application and determine whether all the requirements of the act have been met; if so, the application must be granted." (Syllabus)

Lacivita's Appeal, 54 D. & C. 264 (1945), is to the same effect, also holding that the "Board cannot refuse to grant a restaurant liquor license on the ground that property holders in the vicinity protest that the granting of the license would tend to depreciate real estate values in the vicinity." (Syllabus.)

To the same effect also is Yarosz's License, 47 D. & C. 404.

On the other hand, there is quite a formidable array of decisions to the effect that under sections 403 and

408, construed together and with the rest of the act, the board has a discretion in the transfer of a license.

In Brodsky's License, 44 D. & C. 227 (1942), Judge Milner, putting some emphasis on the title and section 3 of the act, concluded that the board was not without discretion in the matter of a transfer. Section 3 provides:

"This act shall be deemed an exercise of the police power of the Commonwealth for the protection of the public welfare, health, peace and morals of the people of the Commonwealth, and to prohibit forever the open saloon; and all of the provisions of this act shall be liberally construed for the accomplishment of this purpose."

And section 408 provides, in part:

"No transfers shall be made to a person who would not have been eligible to receive the license originally."

We are also especially impressed by the carefully considered opinions in In re Transfer of Liquor License 46 D. & C. 93, and in Loftus' Appeal, 50 D. & C. 422.

In the first case Judge Gordon said (p. 96) :

"It is true that there is no expressed grant of discretionary power to the board in the language of the act itself; neither is there any expressed denial of such a power, but its existence is at least impliedly recognized by the language of section 408, which provides, inter alia, that 'The board is hereby authorized to transfer any license from one person to another, or from one place to another within the same municipality or both, as the board may determine. . . .' We think that there is a measure of discretion in a liquor-licensing authority which is necessarily inherent in its fundamental nature, and which distinguishes it from a mere agency for the issuance of such licenses as mercantile, hunting, or dog licenses, which are primarily

employed for purposes of taxation, rather than as an exercise of the police power over a business peculiarly requiring regulation in the public interest: . . ."

In Loftus' Appeal, supra, the court said (p. 424) :

"Section 403, providing for the grant of the original license, is clearly mandatory and confers no discretion upon the board as to issuing the license, except to determine the compliance of the premises with the physical requirements of the act, its location with relation to certain institutions, and the moral fitness of the applicant . . .

"In section 408 of the act, as amended . . ., the language is strikingly different, the material operative portions being as follows:

" 'The board *is hereby authorized* to transfer any license from one person to another, or from one place to another within the same municipality or both, *as the board may determine* . . .' (Italics supplied.)

"The difference in the language used in these two sections relating to practically the same subject matter, except that one is for the grant of the license and the other is for the subsequent transfer of the license, is striking and, in our opinion, significant. . . ."

After referring to the cases on each side of this question, as we have hereinbefore done, the court continues (p. 429) :

"Frankly, we do not feel that the first group of cases, holding that the power is mandatory, furnish us with much assistance, inasmuch as they are merely categorical declarations that the provision is mandatory. Three of them do not even quote or discuss section 408 of the act, providing for transfers; but apparently base their opinions entirely on the language of section 403. None of those cases even concedes that section 408, providing for transfers, is, or might be, dubious or ambiguous in its terms or meaning so as to call for the

application of the rule of construction provided in section 3 of the act. Not one of those cases refers either to the title of the act or to section 3. We are more impressed with the soundness of the reasoning in the last group of cases, particularly with the opinion of Judge Gordon in In re Transfer of Liquor License, 46 D. & C. 93. We are thoroughly in accord with the reasoning of the court in that case and reach the same conclusion in this case."

The writer also finds himself in accord with Judge Gordon and Judge Boyer.

There is another consideration. The applicant here rests his case on section 403 of the act, which is mandatory in terms, and which applies to an application for new license; but we have held, in the Appeal of the Country Club of Harrisburg, supra (and have consistently adhered to that decision), that the exchange from a beer to a liquor license is not a *new* retail license, and to base this decision exclusively on section 403 would be entirely inconsistent with our ruling.

There is no section of the act which directly applies to the exchange, but, in the writer's opinion, section 408, referring to transfers, is more nearly applicable than section 403; and, in any event, we must construe the whole statute together, including the title, section 3, section 403, and section 408, which leads us to the conclusion that there is a measure of discretion in the board in the matter of the exchange of a license.

We must, therefore, determine whether, under the evidence submitted to us, this transfer should be refused. We repeat that we are without the findings of facts by the board, which we ought to have had.

But, in determining where the evidence leads us, we must be guided by our sworn duty to declare what the law is, however much we may sympathize with the remonstrants.

To illustrate: The pastors of two churches, each about 400 feet away, and the principal and guidance counsellor of the Camp Curtin Junior High School, 475 feet away, object to the license because the children are required to pass the place going to and from church and school. Their objection is that any place that sells liquor is not "a wholesome environment for children". We may agree to that, but the legislature has fixed the distance required between churches, schools and licensed places, and we cannot change the legislative requirements or base our judgment on our own or the ideals of others, not recognized by law.

And we must apply the law as declared in Yarosz's License, 47 D. & C. 404:

"While remonstrants against the issuance of a retail liquor license are entitled to be heard both before the Pennsylvania Liquor Control Board and before the court on appeal, they should be heard only for the purpose of giving competent and relevant testimony; petitions and remonstrances as such have no place in such proceedings under the present laws." (Syllabus.)

In the hearing in this case, notwithstanding our efforts, much testimony was given that was entirely irrelevant.

The applicant became the manager in August 1945 and the owner May 30, 1946. We endeavored to confine the evidence to whatever transpired since August 1945, and we shall not consider any evidence which antedated that time.

Practically all of protestants opposed the sale of intoxicating liquors on general principles. None of them, except W. Thomas Senseman, had been in this place. Much of the testimony was wholly irrelevant. To further illustrate: The pastor of the Methodist Church, about 400 feet away, about three months before the hearing, found a drunken person asleep on

the steps which were in the darkness of a tower leading into the church. There are seven licensed places in a radius of several blocks, but there was no testimony nor even a suggestion that this person came from Waltz's place.

Another illustration: Mrs. Victor Crosson testified as a reason why it was not pleasant to live in the neighborhood that people were "going in there and coming out with bottles in hand, and putting them in the cars". There is nothing illegal about that. She further said that she was afraid of being insulted or accosted at night, although she had never been.

Another witness, Earl Shenk, testified that he objected to "another liquor license place", but that he had "nothing specific to the place named therein".

There was some testimony of offensive conduct, three instances of persons urinating in the neighborhood, but only one of those instances was directly attributable to anyone coming out of these premises. That instance was a man coming out and urinating against the window, and it would be difficult to charge the conduct of that individual against the proprietor.

Two persons testified to a man coming out staggering and getting into his car with difficulty and driving off. One of the witnesses said he was helped in, but that there was no disturbance.

The neighbor living 16 feet away from the licensed premises objected to the dropping of the beer kegs either on the pavement or in the cellar, but the proprietor testifies that the men who delivered the kegs brought their own mats and apparatus.

There was evidence that on one occasion some children looked under a screen door; and one of the witnesses objected because his children did not "have any place to play other than on that pavement and a very small yard, and I do permit them to ride tricycles and wagons around on that pavement".

And other witnesses objected to broken bottles, but only in one case did the evidence show that the person who dropped the bottle came from Waltz's place.

There was testimony of vomiting in Mr. Senseman's vestibule, which is directly across Sixth Street from Waltz's place; and some testimony that there had been vomiting in front of the residence of Mrs. Orris, who lived three doors away from Paul's Tavern, and on one occasion along the fence of the Evangelical United Brethren Church about 400 feet away; but on only one occasion did the testimony—that of Mrs. Orris—attribute the vomiting to a person who came from Paul's Tavern, which was sometime in 1946.

There was also testimony of odors in the summer months because of the cooking, and that there had been an offensive garbage collection in the rear of the establishment; which the proprietor testified he had promptly cleaned up and has kept clean.

Two witnesses testified that on one occasion a man came out with part of his shirt torn, and he got in the car and drove away, but no further circumstances were given.

There was objection that the traffic had increased because of the parked automobiles. But this traffic now exists when the applicant has only a beer license, and we are unable to charge against him any prophecy that more automobiles will be parked in the neighborhood merely because he would be able to sell spirituous liquors. What would be illegal about that?

We have carefully analyzed all of the testimony and we are impressed with the fairness of the testimony of the witness Senseman, which is, in part, as follows:

"Q. Will you tell the court why you object to a liquor license at Paul's Tavern?

"A. On account of what happened before. I feel he was on probation. The place used to be terrible. Since he applied for liquor I can't say that."

After describing the conditions which formerly existed, Mr. Senseman continued:

"Q. You don't blame those conditions on Mr. Waltz now, do you?

"A. No, I can't blame it on Mr. Waltz, you can't blame him———."

And on page 53, after a rather indefinite statement referring to customers:

"Q. How often did his customers commit this?

"A. That happened quite often. Not since he owns the place.

"Q. Not since he owns the place?

"A. No.

"Q. You would say that conditions are materially improved since Mr. Waltz owns this business?

"A. I would."

We might give other excerpts from the testimony.

On the other hand, there were five witnesses called for the applicant, in addition to Waltz, all of whom were patrons, and some of them took their families there for meals. They all testified that Waltz was running the place in a creditable manner. Counsel stated that he had eight or ten additional witnesses in court to offer the same character of testimony.

We are of opinion that protestants, practically all of whom were opposed to the sale of intoxicating beverages, have, in large measure, charged the sins of the former proprietor against Waltz, and have failed to differentiate what could be, under the law, legally chargeable against him.

Counsel for the Liquor Control Board admitted—and we are of opinion that he was justified in so admitting—that the establishment "meets all the requirements of the law" and "we have found nothing against him".

There is one other charge which we have not overlooked. The enforcement officers, who visited the place, testified that they found all the requirements of the law had been met, but discovered that Waltz had been requested by his patrons to allow them to take part in a "Pot of Gold" radio program. The patrons, 49 in number, each deposited 50 cents, and each took a ticket with a State or the District of Columbia written thereon. At 9:30 every Wednesday night there was announced over the radio the name of the State in which the winner of the "Pot of Gold" for that night lived. The holder of that ticket among Waltz's patrons received $24.50, the amount deposited by those who took part. Waltz did not take part, did not profit, and permitted the thing only because the patrons asked him to do so, but as soon as he learned that the Liquor Control Board did not approve it was stopped. The Liquor Control Board has recognized this as a technical violation of the law and suspensed his license for five days. Counsel for the Liquor Control Board announced that Waltz had been, in the board's opinion, sufficiently punished, and they predicated nothing upon this incident. We agree that it was not of sufficient character to impose any further punishment.

We are therefore of opinion that the evidence, as we have analyzed it, is not sufficient to deny applicant the exchange of his malt beverage license for a restaurant liquor license.

### Concurring opinion

RUPP and WOODSIDE, JJ., December 10, 1947.—We concur in the order of the court made in this case, but we disagree as to the scope of the inquiry before this court and the right of this court to receive any testimony in this case.